*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
ELECTRONIC CITATION: 2001 FED App. 0212P (6th Cir.)
File Name: 01a0212p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

JAMES W. CHAMBERS,
     *Plaintiff-Appellant,*

     *v.*

No. 98-6349

DAVID STENGEL, in his
capacity as Jefferson County
Commonwealth Attorney;
MICHAEL CONLIFFE, in his
official capacity as Jefferson
County Attorney,
     *Defendants-Appellees,*

A.B. CHANDLER, III,
     *Intervenor
     Defendant-Appellee.*

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 97-00448—Thomas B. Russell, District Judge.

Argued: September 17, 1999

Decided and Filed: July 9, 2001

Before: WELLFORD, SUHRHEINRICH, and COLE,
Circuit Judges.

1

_____

**COUNSEL**

**ARGUED:**     David A. Friedman, FERNANDEZ, FRIEDMAN, GROSSMAN & KOHN, Louisville, Kentucky, for Appellant.  Vanessa Lynn Armstrong, OFFICE OF THE ATTORNEY GENERAL, CIVIL AND ENVIRONMENTAL LAW DIVISION, Frankfort, Kentucky, for Appellees. **ON BRIEF:**     David A. Friedman, FERNANDEZ, FRIEDMAN, GROSSMAN & KOHN, Louisville, Kentucky, for Appellant.  Vanessa Lynn Armstrong, OFFICE OF THE ATTORNEY GENERAL, CIVIL AND ENVIRONMENTAL LAW DIVISION, Frankfort, Kentucky, for Appellees.

_____

**OPINION**

_____

  R. GUY COLE, JR., Circuit Judge.  Plaintiff-Appellant James W. Chambers, an attorney practicing personal-injury law in Kentucky, brought an action under 42 U.S.C. § 1983 in federal district court seeking declaratory and injunctive relief.  Chambers challenges the constitutionality of Ky. Rev. Stat. Ann. §§ 21A.300 and 21A.310, which prohibit and criminalize the solicitation of accident victims by attorneys within thirty days of an accident.  The district court granted summary judgment in favor of Jefferson County Attorney David Stengel, Commonwealth Attorney Michael Conliffe, and Kentucky Attorney General A. B. Chandler, III, who intervened in the action, ("Defendants"), holding that the statutes are constitutional.  On appeal, Chambers argues that the district court erred in that the statutes: (1) violate the Due Process Clause because they are unconstitutionally vague; (2) violate the Equal Protection Clause because they single out and discriminate against attorneys; and (3) violate the First Amendment because they criminalize constitutionally protected speech.  For the following reasons, we **AFFIRM** the judgment of the district court.

**BACKGROUND**

Kentucky Revised Statute § 21A.160 states:

> The Supreme Court has power to provide for the organization, government and membership of the state bar of Kentucky and to adopt rules and regulations to govern conduct and activity of the state bar and its members.

KY. REV. STAT. ANN. § 21A.160. In 1996, Kentucky enacted § 21A.300, which states:

> (1) Notwithstanding KRS 21A.160, for a period of thirty (30) days following the filing of a criminal or civil action, or claim for damages, or a traffic citation, injury, accident, or disaster, an attorney or an attorney referral service shall be subject to the following prohibition. An attorney or an attorney referral service shall not directly solicit, or knowingly permit another person to directly solicit on his or its behalf, a victim of the accident or disaster, or a relative of the victim, for the purpose of obtaining professional employment relating to a criminal or civil action, or claim for damages, arising out of the traffic citation, injury, accident, or disaster.
>
> (2) Notwithstanding KRS 21A.160, an attorney shall not knowingly accept a referral from an attorney referral service when that referral has resulted from the attorney referral service violating the prohibition established in subsection (1) of this section.

KY. REV. STAT. ANN. § 21A.300. A violation of § 21A.300 is a Class A misdemeanor punishable by a term of imprisonment up to one year, a penalty, or discipline by the Kentucky Supreme Court. *See* KY. REV. STAT. ANN. § 21A.310.

Before the enactment of §§ 21A.300 and 21A.310, Chambers routinely engaged in direct-mail solicitation of accident victims. During the pendency of Chambers's

lawsuit, the parties entered into a joint agreement stipulating that the portions of the statute that prohibited solicitation for thirty days following "the filing of a criminal or civil action, or claim for damages, or a traffic citation" were unconstitutional. Defendants conceded that those portions of the statute were not narrowly drawn, nor did they materially advance a substantial state interest. The joint agreement provided that Defendants would be permanently enjoined from enforcing those portions of the statute. The parties then filed cross-motions for summary judgment as to the constitutionality of the remaining portions of the statute, *i.e.*, the thirty-day prohibition of attorney solicitation of victims of an accident, injury, or disaster. The district court granted Defendants' motion, holding that §§ 21A.300 and 21A.310 violated neither the Due Process Clause, the Equal Protection Clause, nor the First Amendment. This appeal follows.

## DISCUSSION

We review the grant of summary judgment and the constitutionality of a statute de novo. *See Kildea v. Electro-Wire Prods., Inc.*, 144 F.3d 400, 407 (6th Cir. 1998). Summary judgment is appropriate when there exists "no genuine issue of material fact and . . . the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

### I. DUE PROCESS CLAUSE

In *Columbia Natural Res., Inc. v. Tatum*, 58 F.3d 1101, 1104 (6th Cir. 1995), we recognized that the Due Process Clause provides the foundation for a challenge to a statute based on vagueness. The "void for vagueness" doctrine has primarily two goals: first, to ensure fair notice to citizens, and second, to provide standards for enforcement by the police, judges, and juries. *See id.* As stated by the Supreme Court:

## CONCLUSION

Accordingly, we **AFFIRM** the judgment of the district court.

With regard to the question of whether the statutes are narrowly drawn, Chambers argues that because they are general criminal statutes, rather than rules of the Bar, they are more extensive than necessary. The test we are to apply requires us to determine whether there exists a "reasonable fit" between the legislature's goal and the means chosen to accomplish it. As stated in *Went For It*:

> Passing to *Central Hudson's* third prong, we examine the relationship between the Bar's interests and the means chosen to serve them. With respect to this prong, the differences between commercial speech and noncommercial speech are manifest. . . [T]he "least restrictive means" test has no role in the commercial speech context. What our decisions require, instead, is a fit between the legislature's ends and the means chosen to accomplish those ends, a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served, that employs not necessarily the least restrictive means but a means narrowly tailored to achieve the desired objective. Of course, we do not equate this test with the less rigorous obstacles of rational basis review; . . . the existence of numerous and obvious less-burdensome alternatives to the restriction on commercial speech is certainly a relevant consideration in determining whether the 'fit' between ends and means is reasonable.

*Id.* at 632 (internal quotation marks, citations, and alterations omitted).

Although the statutes here arguably do not employ the least restrictive means necessary, we recognize that the least restrictive means are not necessary in order for the statutes to withstand constitutional scrutiny. The statutes' scope clearly is proportional to the interest served, and therefore, they satisfy the "narrowly tailored" prong of the test.

It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application.

*Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972) (footnote omitted). Although a statute is void for vagueness only if it is so vague that "no standard of conduct is specified at all," *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971), we have held that a "relatively strict test is warranted" when criminal penalties are at stake, *Women's Med. Prof'l Corp. v. Voinovich*, 130 F.3d 187, 197 (6th Cir. 1997).

Chambers argues that the statute's prohibition on "solicitation" is vague insofar as it does not distinguish between solicitation and other non-soliciting contact. For example, Chambers asserts that it is unclear whether the statute prohibits sending a condolence card on legal stationery. He also claims that the statute is unclear as to whether the term "victim" includes the tortfeasor, or whether an "accident or disaster" victim includes a victim of intentional conduct. Finally, Chambers argues that § 21A.320, an exception to the statute which permits solicitation of a victim of an accident or disaster through "advertising directed to the general public," does not sufficiently define "general public."

Chambers's argument lacks merit and does little to undermine the general understanding of the conduct

prohibited.   The terms "solicit," "victim," "accident or disaster," and "general public" are common terms, and individuals of common intelligence do not have to guess at their meaning.  The statutes sufficiently set out the conduct prohibited such that they give fair notice to citizens and do not encourage arbitrary or discriminatory enforcement by police, judges, or juries.  Accordingly, we AFFIRM the district court on this ground.

## II. EQUAL PROTECTION CLAUSE

The Equal Protection Clause requires that "all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).  The Supreme Court has clarified, however, "Equal protection does not require that all persons be dealt with identically, but it does require that a distinction made have some relevance to the purposes for which the classification is made." *Baxstrom v. Herold*, 383 U.S. 107, 111 (1966).  Where a fundamental right is involved, we apply a strict scrutiny standard of review to content-based regulations to determine whether the statute is narrowly tailored to achieve a compelling state interest. *See Grider v. Abramson*, 180 F.3d 739, 748 (6th Cir. 1999). If the regulation is content-neutral, however, such as a time, place, or manner restriction, we apply a more relaxed intermediate scrutiny, "whereby a restriction will survive constitutional assessment if the implicated measure was narrowly fashioned to further a significant governmental interest." *Id.*

In a case such as ours, where commercial speech is involved, only "a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values" is required. *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456 (1978); *see also Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*, 447 U.S. 557, 562-63 (1980) (holding that intermediate scrutiny applies to a First Amendment challenge involving commercial speech). Because regulation of commercial speech is subject to intermediate scrutiny in a First Amendment challenge, it

invasion of privacy that reflects poorly on the practice of law. *See id.*[1]

Chambers tries to distinguish *Went For It* by arguing that Kentucky has not established that its citizens think less of lawyers because of the conduct at issue, nor has the statute shown that the commercial speech restrictions set forth in the statutes will alleviate this conduct.  His argument is without merit. Defendants submitted ample evidence establishing that the statutes directly and materially advance the state's interests, including (1) the 106-page Florida study from the *Went For It* case; (2) an affidavit from Kentucky Representative Lawrence D. Clark, who sponsored the statutes and stated that after he was involved in a vehicular accident, he received at least fifteen solicitation letters from attorneys; (3) an affidavit from the Executive Director of the Kentucky Bar Association setting forth a summary of a Kentucky survey report, which revealed the public's displeasure with attorney solicitation following an accident; (4) articles and letters appearing in *The Courier-Journal* and the *Kentucky Bench and Bar*; and (5) statistics of the frequency of automobile accidents in Kentucky. Accordingly, we hold that the record contains more than "mere speculation and conjecture" and that Kentucky's interests in protecting the privacy of its citizens and the reputation of its attorneys are directly and materially advanced by the statutes at issue. *See id.* at 626.

---

[1] Specifically, the Florida study found that as of June 1989, 70,000 direct-mail solicitations were sent by attorneys in Florida annually, forty percent of which were directed at accident victims or their survivors. *See Went For It*, 515 U.S. at 626. Fifty-four percent of the general population surveyed stated that contacting persons concerning accidents is an invasion privacy. *See id.*  In a random sampling of individuals surveyed who had received direct-mail solicitation, forty-five percent stated that such solicitation is "designed to take advantage of gullible or unstable people," thirty-four percent said that such tactics were "annoying or irritating," twenty-six percent found it to be "an invasion of privacy," twenty-seven percent reported that it lowered their regard for lawyers and the judicial process as a whole, and twenty-four percent found that it angered them. *See id.* at 626-27.

Court held that the solicitation of accident victims and their families in the immediate aftermath of an accident is subject tot state regulation, concluding that the restriction on commercial speech withstood First Amendment scrutiny. *See id.* at 635.

Here, the parties agree that the proper standard for evaluating a restriction on commercial speech is the intermediate scrutiny test set forth in *Central Hudson*. Under *Central Hudson*, the government may freely regulate commercial speech that is misleading or concerns unlawful activity. *See Central Hudson*, 447 U.S. at 563-64. If the commercial speech does not fall into either category, as is the case here, the government must satisfy a three-prong test in order to restrict the speech. *See id.* First, the government must assert a substantial interest in support of its regulation; second, the government must demonstrate that the restriction on commercial speech directly and materially advances that interest; and third, the regulation must be "narrowly drawn." *See id.* at 564-65. Chambers concedes that for purposes of the First Amendment, the asserted state interests are substantial. Thus, we need only address the second and third prongs of the *Central Hudson* test, *i.e.*, whether the statutes directly and materially advance the state interests and whether they are narrowly drawn.

In *Went For It*, the Court found that Florida's commercial speech restriction directly and materially advanced the interests cited because the state adequately demonstrated that "the harms it recite[d] are real and that its restriction will in fact alleviate them to a material degree." *Went For It*, 515 U.S. at 626. In so finding, the Court relied on a two-year state study of attorney advertising and solicitation, which included hearings, surveys, reports, and extensive public commentary. The study indicated that the public viewed direct-mail solicitation in the immediate wake of an accident as an

follows that equal protection claims involving commercial speech also are subject to the same level of review. *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 385 (1992) (noting that the First Amendment underlies the Court's equal protection analysis). Thus, we must decide whether the classifications in the statutes at issue are narrowly tailored to further a significant governmental interest.

Here, Chambers argues that because the statutes target attorneys—plaintiffs' attorneys in particular—they violate the Equal Protection Clause. Defendants maintain, however, that the statutes are narrowly tailored to advance state interests in that: (1) they protect the privacy and tranquility of personal injury victims and their families from intrusive, unsolicited attorney contact; and (2) they protect the reputation of attorneys by prohibiting them from engaging in contact "usually regarded as deplorable because of its intrusion upon the special vulnerability and private grief of victims or their families." Chambers asserts that the government's first stated interest is inadequate to justify the statutes and that its second stated interest should not be considered because only the judiciary can regulate the conduct of attorneys in Kentucky.

With regard to Chambers's concern that only the judiciary can regulate the conduct of attorneys, we had a similar concern and therefore certified that very question to the Kentucky Supreme Court by order dated January 7, 2000. We asked the state supreme court to address the following issue:

> Whether the Kentucky legislature impermissibly violated separation of powers principles by the enactment of KRS §§ 21A.300 and 21A.310(1), which regulate attorneys in the practice of law, a matter generally dealt with by the Kentucky Supreme Court as set out in Ky. Const. § 116 and KRS § 21A.160.

*Chambers v. Stengel*, No. 98-6349 (6th Cir. Jan. 7, 2000) (order). Per our request for a certification of law, the Kentucky Supreme Court recently held that §§ 21A.300 and 21A.310 do not violate separation of powers principles, stating:

Pursuant to its police power, the General Assembly may enact legislation to protect the Commonwealth's citizens' health and welfare, and any such statute is presumed to be constitutional if it appears that the provisions have a substantial tendency to provide such protections. In this instance, the General Assembly was responding to a public outcry against the practices of immediate solicitation, which it found caused further emotional harm to the accident and disaster victims receiving such mailings.

. . . .

In upholding the constitutionality of these statutes, we find that the General Assembly enacted a valid exercise of police power which protects both Kentuckians and Kentucky lawyers from predatory activity. This Court retains the power to discipline Kentucky attorneys who are convicted under these statutes just as we have the power to discipline Kentucky attorneys who violate any other statute.

*Chambers v. Stengel*, 37 S.W.3d 741, 743-44 (Ky. 2001) (citation omitted). Accordingly, we hold that the statutes do not violate separation of powers principles under Kentucky law.

With regard to the question of whether Kentucky has a substantial interest in protecting both the privacy of its citizens and the reputation of its attorneys, we hold that it does. The United States Supreme Court recognized similar state interests when addressing a challenge to the First Amendment:

States have a compelling interest in the practice of professions within their boundaries, and . . . as part of their power to protect the public health, safety, and other valid interests they have broad power to establish standards for licensing practitioners and regulating the practice of professions. . . . [T]he State's interest in protecting the well-being, tranquility, and privacy of the

home is certainly of the highest order in a free and civilized society. Indeed, we have noted that a special benefit of the privacy all citizens enjoy within their own walls, which the State may legislate to protect, is an ability to avoid intrusions.

*Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 625 (1995) (internal quotation marks and citations omitted). Although *Went For It* involved a challenge to the First Amendment, the Court clearly indicated that such state interests are substantial.

We also find the statutes to be narrowly fashioned to advance those interests. Although the statutes do target attorneys, there is no evidence in the record before us that any other profession engages in the type of solicitation conducted by attorneys. Accordingly, we conclude that the classification of attorneys in the statutes is narrowly tailored to further substantial governmental interests and, thus, comports with the Equal Protection Clause.

### III. FIRST AMENDMENT

Finally, Chambers argues that the statutes constitute an unreasonable regulation of commercial speech, thereby denying him his right to free speech under the First Amendment. Although commercial speech generally is not entitled to the same level of protection afforded other forms of speech, *see Central Hudson*, 447 U.S. at 562-63, the Supreme Court has reaffirmed the protected status of commercial speech in the area of attorney advertising, including targeted, direct-mail solicitation, *see Shapero v. Kentucky Bar Ass'n*, 486 U.S. 466, 472-74 (1988).

In *Went For It*, a case similar to the one before us, the Court addressed a challenge to the Florida Bar Rules prohibiting attorneys from sending written communications to a prospective client for the purpose of obtaining employment concerning personal injury, wrongful death, or otherwise related to an accident or disaster occurring within thirty days of the communication. *See Went For It*, 515 U.S. at 635. The