**Robin K.A. FICKER**

v.

**J. Joseph CURRAN, Jr., Attorney General of Maryland.**

**Civil Action No. WMN–96–2057.**

United States District Court, D. Maryland.

Oct. 18, 1996.

Robin K.A. Ficker, Bethesda, MD, pro se.

Alan E. D'Appolito, Upper Marlboro, MD, for plaintiff Natalie M. Boehm.

Carmen M. Shepard and Margaret Witherup Tindall, Baltimore, MD, and Attorney General of Maryland, for defendants.

*MEMORANDUM*

NICKERSON, District Judge.

Before the Court are cross-motions for summary judgment filed by Plaintiff Natalie M. Boehm (Paper No. 14), Plaintiff Robin

K.A. Ficker (Paper No. 18), and Defendant J. Joseph Curran, Jr., Attorney General of Maryland (Paper No. 15). As the parties have represented that they do not intend to file any additional papers in support of their respective motions, the motions are now ripe for decision. Upon a review of the motions and the applicable case law, the Court determines that no hearing is necessary (Local Rule 105.6) and that Plaintiffs' motions for summary judgment will be granted.[1]

## I. BACKGROUND

This is an action for declaratory and injunctive relief challenging the constitutionality of a provision recently passed by the Maryland legislature and signed into law by Governor Parris N. Glendening regulating the solicitation of clients by attorneys. Senate Bill 14, 1996 Md.Laws ch. 669. Section 1(A)(2) of Bill 14 provides:

> (A) A lawyer may not send a written communication, directly or through an agent, to a prospective client for the purpose of obtaining professional employment if the communication concerns: ...
>
> (2) a criminal prosecution, or a prosecution of a traffic offense that carries a period of incarceration, involving the person to whom the communication is addressed or the person's relative, unless the charging document was filed more than 30 days before the date the communication is mailed.[2]

Pursuant to Section 10–606 of Maryland's Business and Occupations Code, any person who violates the new law may be found guilty of a misdemeanor punishable by a fine of up to $1,000 and/or incarceration for up to one year. The new law went into effect on October 1, 1996.

Plaintiff Ficker is a Maryland attorney who alleges that, until this bill went into effect, he obtained virtually all of his client base through direct-mail solicitation of those charged with jailable traffic offenses. Plaintiff Boehm owns and operates a company that produces and mails advertising materials from attorneys to persons who have been charged with crimes and jailable offenses. Both Ficker and Boehm challenge § 1(A)(2) as violative of their First Amendment rights of free speech and seek an order declaring § 1(A)(2) unconstitutional and permanently enjoining its enforcement.

This is a somewhat unusual case in that the Attorney General, the party now asking the Court to uphold the constitutionality of § 1(A)(2), is also the party that has provided the Court with perhaps the most compelling arguments against the constitutionality of that same provision. Before Governor Glendening signed the subject legislation, the Attorney General's office reviewed the bill for constitutionality and legal sufficiency. *See* Letter from Joseph Curran to Governor Glendening, dated May 16, 1996 (attached to Defendant's Motion as Exhibit 1). Upon review of the bill, the Attorney General's office concluded, "it is our view that the portions of the bill restricting contact with persons who have been charged with traffic and criminal offenses are invalid and should not be enforced." *Id.* at 1. Despite the infirmities of the portion of the bill that this Court now reviews, the Attorney General recommended that the Governor sign the legislation, based on the conclusion that the provisions of the

---

1. Also pending before the Court is Plaintiff Ficker's preliminary injunction motion in which he sought to temporarily bar the enforcement of the provision that is the subject of this suit. Paper No. 17. After a hearing on September 27, 1996, the Court denied a similar motion on the basis that the parties charged with the actual responsibility of enforcing this provision, the State's Attorneys, were not made parties to this action. When it became apparent that Plaintiffs' delay in bringing in the State's Attorneys made it likely that the Court could resolve the merits of the action before preliminary injunctive relief could be provided, the Court elected not to address the preliminary injunction motion. It will be denied as moot. Also before the Court are Plaintiffs'

motions to amend their respective complaints to add the State's Attorneys as defendants. Papers Nos. 21 & 24. These motions also will be denied as moot. One additional motion is pending, the Motion of the Maryland Criminal Defense Attorneys' Association ["MCDAA"] to Appear as Amicus. Paper No. 26. That motion is unopposed and will be granted.

2. Section 1(A)(1) of Senate Bill 14 makes it unlawful for an attorney to use targeted direct-mail to solicit personal injury plaintiffs within thirty days of the accident or disaster that gave rise to the potential cause of action. This aspect of the bill is not challenged in this action.

bill regulating solicitation of personal injury plaintiffs was constitutional and the two provisions were expressly made severable.[3]

## II. DISCUSSION

In arguing that § 1(A)(2) is unconstitutional, Plaintiffs rely heavily on the Supreme Court's decision in *Shapero v. Kentucky Bar Association*, 486 U.S. 466, 108 S.Ct. 1916, 100 L.Ed.2d 475 (1988). In *Shapero*, the Court addressed "the issue whether a State may, consistent with the First and Fourteenth Amendments, categorically prohibit lawyers from soliciting legal business for pecuniary gain by sending truthful and nondeceptive letters to potential clients known to face particular legal problems." 486 U.S. at 468, 108 S.Ct. at 1919. Specifically, the plaintiff challenged a decision of the Kentucky Attorneys Advertising Commission refusing to allow him to send targeted letters to persons who recently had foreclosure suits filed against them placing those individuals at risk of losing their homes.

In concluding that such a categorical ban on targeted direct-mail solicitation was unconstitutional, the Court in a 5–4 decision reemphasized that "lawyer advertising is in the category of constitutionally protected commercial speech." *Id.* at 472, 108 S.Ct. at 1921 (citing *Bates v. State Bar of Arizona*, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977)). The Court then summarized the principles governing state regulation of attorney advertising:

> Commercial speech that is not false or deceptive and does not concern unlawful activities may be restricted only in the service of a substantial governmental interest, and only through means that directly advance that interest. Since state regulation of commercial speech may extend only as far as the interest it serves, state rules that are designed to prevent the potential for deception and confusion may be no broader than reasonably necessary to prevent the perceived evil.

486 U.S. at 472, 108 S.Ct. at 1921 (citations and internal quotations omitted).

In arguing that § 1(A)(2) is constitutional, the Attorney General relies on the Supreme Court's more recent decision in *Florida Bar v. Went For It, Inc.*, —— U.S. ——, 115 S.Ct. 2371, 132 L.Ed.2d 541 (1995). In *Went For It*, the Court considered the constitutionality of a disciplinary rule, proposed by the Florida Bar and adopted by the Florida Supreme Court, prohibiting lawyers from sending direct-mail solicitations to victims and their relatives for thirty days following an accident or disaster. Distinguishing the case before it from prior decisions, including *Shapero*,[4] the Court in another 5–4 decision found this thirty day ban to be a permissible regulation of commercial speech. In reaching that decision, the Court applied the three part "intermediate scrutiny" test outlined in *Central Hudson Gas & Electric Corp. v. Public Service Comm'n of N.Y.*, 447 U.S. 557, 564–565, 100 S.Ct. 2343, 2350–2351, 65 L.Ed.2d 341 (1980): "first, the government must assert a substantial interest in support of its regulation; second, the government must demonstrate that the restriction on commercial

---

**3.** The Attorney General attached the May 16, 1996 to his pleading "for the limited purpose of showing that there [was] no immediate threat of enforcement" of the provision. Defendant's Memorandum at 9 n. 1. This claim was made in support of the Attorney General's argument that Plaintiff Ficker's Motion for Preliminary Injunction should be denied. The Attorney General also emphasizes that the letter "is not relevant to the issue of whether § 1(A)(2) is constitutional." *Id.* The Court acknowledges that it is in no way bound by the prior opinion of the Attorney General's office, any more than it is bound by the Attorney General's current position. The Court quotes extensively from the Attorney General's letter, however, not because it is bound by that letter, but because it finds the letter's arguments compelling and its conclusion inescapable.

**4.** In its Amicus brief, the MCDAA argued that the Supreme Court not only distinguished, but "tamed *Shapero*, leaving it controlling only on its particular facts." Brief at 5. After presenting its analysis of the alignment of the various justices in the split decisions in *Shapero* and *Went For It*, the MCDAA invites this Court to read the "judicial tea leaves" and look for guidance, not in the majority opinion in *Shapero*, but in the dissenting opinion. *Id.* at 4 n. 5. The MCDAA may well be correct that the changing composition of the Supreme Court will lead to a change in the scope of the First Amendment protections afforded attorney advertising. Until that change occurs, however, this Court is bound to apply the law as it now stands. This Court does not find in *Went For It* the sweeping implications found by the MCDAA.

speech directly and materially advances that interest; and third, the regulation must be 'narrowly drawn.' " *Went For It*, —— U.S. at ——, 115 S.Ct. at 2376.

As justification for the thirty day ban on solicitation, the Florida Bar asserted that it has a "substantial interest in protecting the privacy and tranquility of personal injury victims and their loved ones against intrusive, unsolicited contact by lawyers." —— U.S. at ——, 115 S.Ct. at 2376. The Bar argued that this interest was related to the Bar's concern for the negative impact such conduct had on the public's image of the legal profession, which in turn, negatively affected the administration of justice. *Id.* The Supreme Court concluded that it had "little trouble" crediting these interests as "substantial." *Id.*

In finding that the Florida Bar had satisfied the second prong of the *Central Hudson* test as well, the Court noted that the Bar had submitted a 106–page summary of a two year study on lawyer advertising and solicitation, supporting the conclusion that "the Florida public views direct-mail solicitation in the immediate wake of accidents as an intrusion on privacy that reflects poorly upon the profession." *Id.* at ——, 115 S.Ct. at 2377. The Bar also submitted an anecdotal record that the Court found "noteworthy for its breadth and detail." *Id.* In addressing the third prong of *Central Hudson*, the Court found lacking arguments that less restrictive means were available to serve the purported interest and held that the thirty-day waiting period was "reasonably well tailored." *Id.*

In the instant action, the State asserts similar "substantial interests" to those advanced in *Went For It.* The Attorney General avers that § 1(A)(2) was passed as a means "to protect the privacy and tranquility of Maryland citizens from crass commercial intrusion during times of extremely personal stress and anxiety," and "to protect and promote the integrity of the legal profession." Defendant's Memorandum at 12. Thus, the Court must find that the subject legislation passes the first prong of the *Central Hudson* test.

To meet the second prong of *Central Hudson*, the State must demonstrate "that the challenged regulation advances the Government's interest in a direct and material way. That burden ... is not satisfied by mere speculation and conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Went For It*, —— U.S. at ——, 115 S.Ct. at 2377 (citations and internal quotations omitted). In arguing that § 1(A)(2) meets this standard, the Attorney General again attempts to parallel the arguments made by the Florida Bar in *Went For It.* The Court finds, however, for the reasons that follow, that a thirty day ban on direct-mail to individuals facing criminal prosecutions presents entirely different issues and interests than does a similar ban on solicitation of personal injury plaintiffs.[5]

In *Went For It*, the Florida Bar amassed considerable evidence that Florida citizens were offended at attorneys' direct-mail efforts aimed at recent victims of accidents or disasters. As noted, *supra*, the Supreme Court commented on the breath of that evidence. Although there is some language in *Went For It* that could support the inference that the public might be offended by direct-mail from attorneys in other contexts as well, it is clear that the evidence was focused on the outrage felt by those who had recently suffered a personal injury or the loss of a loved one. The Court cited the examples of: a Florida citizen who was "appalled and angered by the brazen attempt of a law firm to solicit him by letter shortly after he was injured and his fiancee was killed in an auto accident;" a citizen who found it "beyond comprehension" that his nephew's family received a letter from an attorney on the day of his nephew's funeral; and, a letter sent to an attorney complaining, "I consider the unsolicited contact from you after my child's acci-

---

**5.** In the Attorney General's letter to the Governor, Mr. Curran acknowledged that "[t]he situation with respect to the ban on solicitations with respect to criminal prosecutions and traffic offenses is different [than a ban on solicitation of personal injury victims]." May 16, 1996 Letter at 3.

dent to be of the rankest form of ambulance chasing and in incredibly poor taste.... I cannot begin to express with my limited vocabulary the utter contempt in which I hold you and your kind." —— U.S. at ——, 115 S.Ct. at 2377 (quoting summary of study commissioned by Florida Bar).

In contrast, the Attorney General in the instant action supports the constitutionality of § 1(A)(2) with the brief opinions of two witnesses who testified at the hearing on Senate Bill 14. *See* Defendant's Exhibit 2, Testimony of Leonard Shapiro and Bruce Lamdin Before the Senate Judicial Proceedings Committee, January 18, 1996. While one of those witnesses did make a generalized claim that "this ... uh ... solicitation situation cheapens the profession," the clear emphasis of the testimony of both witnesses was that persons who had been solicited were upset that the soliciting attorneys had found out that they were arrested, not that the attorney had acted on that information by sending them letters.[6] For example, Leonard Shapiro testified that his accountant, after being charged with a DWI offense, "called me literally in tears *wanting to know how people knew about his arrest* because he

had received three unsolicited letters from lawyers." Defendant's Exhibit 2 at 2 (emphasis added). Bruce Lamdin testified that a number of his clients who had received solicitation letters were "offended that *someone has been advised without their knowledge that they were arrested for something.*" *Id.* at 6 (emphasis added).[7]

As the Attorney General in his letter to the Governor correctly observed, the type of intrusion about which these witnesses testified is very different than the intrusion that concerned the Florida Bar and the Supreme Court in *Went For It.* Furthermore, this type of intrusion is precisely the type of intrusion that the Supreme Court in *Shapero* held could not support the restriction of commercial speech. As the Attorney General stated:

> In *Went For It*, the Supreme Court expressly noted that solicitation in criminal cases involved a "different kind of intrusion" than the "crass commercial intrusion by attorneys upon their personal grief in times of trauma" regulated by the Florida rule. [*Went For It*, —— U.S. at ——, 115 S.Ct.] at 2379. The offensiveness of this intrusion stems not from the offensiveness

---

**6.** Of equal if not greater concern to the witnesses at the hearing on Senate Bill 14 was the potential for confusion caused by targeted direct-mail. Both witnesses recounted stories of individuals who, upon receipt of a letter from an attorney, believed that this attorney had been "assigned" to represent them. The MCDAA in its amicus brief filed in support of Defendant's motion, echoed this concern. *See* Amicus Brief at 2 n. 2.

It does not appear that this concern regarding potential confusion is an interest that the State now advances in support of the legislation. Under the intermediate scrutiny afforded restrictions on commercial speech, a court is " 'not permit[ted] to supplant the precise interests put forward by the State with other suppositions.' " *Went For It*, —— U.S. at ——, 115 S.Ct. at 2376 (quoting *Edenfield v. Fane*, 507 U.S. 761, 768, 113 S.Ct. 1792, 1798, 123 L.Ed.2d 543 (1993)). Even were the Court to consider this interest, it is doubtful that the legislation would be found to be narrowly tailored under the third prong of *Central Hudson.* As the Supreme Court observed in *Shapero*:

> [M]erely because targeted, direct-mail solicitation presents lawyers with opportunities for isolated abuses or mistakes does not justify a total ban on that mode of protected commercial speech. The State can regulate such abuses and minimize mistakes through

far less restrictive and more precise means, the most obvious of which is to require the lawyer to file any solicitation letter with the state agency, giving the State ample opportunity to supervise mailings and penalize actual abuses.

*Shapero*, 486 U.S. at 476, 108 S.Ct. at 1923 (citing *In re R.M.J.*, 455 U.S. 191, 203, 206, 102 S.Ct. 929, 937, 939, 71 L.Ed.2d 64 (1982)). If the targeted direct-mail is misleading, that can be regulated, short of imposing a thirty day ban.

**7.** This Court also has considerable concerns as to the weight that should be accorded the testimony of these witnesses. Unlike the independent consulting firm that conducted the study on public attitudes concerning lawyer solicitation in *Went For It*, the two witnesses whose testimony is offered in the instant action are criminal attorneys who apparently do not use direct-mail but are in direct competition with those attorneys that do. *See* Defendant's Exhibit 2 at 5, Testimony of Bruce Lamdin ("But I think it's unique that you have four lawyers here who have very good practices and we're all in uh ... support of this bill and I think what this bill seems to indicate to me is you have lawyers that maybe aren't doing so well they're using this as an avenue to try to expand their practices ... which I think is wrong.").

of the suggestion to a person, at the height of their trauma and grief that their tragedy should be measured in monetary terms. The Court therefore differentiated [*Shapero* ] which had rejected invasion of privacy as a basis for a general ban on direct mail solicitation where "[t]he invasion, if any, occurs when the lawyer discovers the recipient's legal affairs, not when he confronts the recipient with the discovery." *Shapiro* [Shapero], at 476 [108 S.Ct. at 1923]. . . .

While the committee files do reflect that some persons who had been arrested found it very upsetting to receive these solicitations and that such solicitation has a negative effect on the public perception of attorneys, their negative feelings appeared to stem from the type of invasion of privacy concerns rejected in *Shapiro [Shapero]. No evidence in the files reflects that citizens generally find it offensive that attorneys offer information and services to traffic and criminal defendants who, in fact, desperately need them.* Therefore, it is our view that this portion of the bill in unconstitutional and should not be enforced.

Defendant's Exhibit 1 at 3–4 (emphasis added).

To be sure, a person recently arrested for driving under the influence may experience some embarrassment upon the discovery that others know of his plight. In the same way, the potential recipient of the solicitation letter at issue in *Shapero* might be embarrassed that others are aware that he or she was facing financial difficulties sufficient to place their home at risk. The protection of individuals from the potential embarrassment that might come with the discovery that certain aspects of one's life are part of the public record, however, is not a sufficient interest to justify the restriction of speech, even commercial speech.

The second aspect of the restriction of speech imposed by § 1(A)(2) that renders it readily distinguishable from the restriction imposed by the Florida Bar in *Went For It* relates to the urgency of the need for representation in a criminal proceeding. A person injured in an accident or disaster typically has three years in which to decide whether or not to file a legal action related to his or her injury. In contrast, the criminal defendant is already in litigation. Again, to quote from the Attorney General's letter to Governor Glendening, "A criminal defendant has no choice as to whether to be involved in a legal case, and often must act quickly in order to preserve important rights." Defendant's Exhibit 1 at 3.

Because of the speed in which criminal proceedings of this sort often progress, Plaintiffs argue that the thirty day ban is tantamount to the categorical prohibition of targeted direct-mail held to be unconstitutional in *Shapero*. Plaintiffs represent that in many instances the entire judicial process will have reached its conclusion before the 30 days prescribed by § 1(A)(2) has run. The Attorney General nowhere disputes this claim, but merely argues that criminal defendants are able to find counsel through other means during the "modest thirty-day waiting period." [8] Defendant's Memorandum at 18. "After those thirty days," he opines, "attorneys are free to send targeted mailings." *Id.* Defendant's response ignores the reality that after thirty days the need for representation may have passed, or at the least, the vast majority of criminal defendants would have already obtained counsel. Contrary to the Attorney General's minimization of the impact of this restriction, the actual consequence of the provision is to effectively ban direct-mail solicitation of defendants facing jailable traffic offenses. Such a ban, this

---

**8.** Echoing an observation made by the Supreme Court in *Went For It,* the Attorney General argues that there are ample alternative avenues for criminal and traffic offense defendants to receive information about legal services during the thirty day period including: newspaper advertisements; radio and television ads; telephone directory listings; and, billboard advertising. Defendant's Memorandum at 15. This Court understands the preference shown by the Supreme Court for these non-targeted means of communication in the context of personal injury actions. In the context of persons facing jailable charges, however, this Court finds that it what be somewhat incongruous to conclude that the administration of justice would be better served by encouraging these individuals to rely upon the quality of advertisements typically found on television or on billboards as their source of information concerning important legal rights.

Court finds, is unconstitutional under *Shapero.*

This Court is certainly mindful of the need to rehabilitate the image that attorneys have acquired in our society. But the Court is also mindful that the State's interest in redeeming that image is derivative of the State's interest in the fair administration of justice. *See Went for It,* —— U.S. at ——, 115 S.Ct. at 2376 (observing that Florida Bar's interest in protecting privacy of personal injury victims "obviously factors into the Bar's paramount . . . objective of curbing activities" that "negatively affec[t] the administration of justice"). When the Supreme Court first extended First Amendment protection to lawyer advertising in *Bates,* it did so recognizing that the dissemination of information to the public, even through advertising, had the potential to "offer great benefits" to the administration of justice. 433 U.S. at 376, 97 S.Ct. at 2705. *See also Peel v. Attorney Registration & Disciplinary Commission of Illinois,* 496 U.S. 91, 110, 110 S.Ct. 2281, 2292–93, 110 L.Ed.2d 83 (1990) (in holding that attorneys had a constitutional right to advertise certification as specialist, observing "[i]nformation . . . facilitates the consumer's access to legal services and thus better serves the administration of justice").[9] In light of the ultimate goal of promoting the fair administration of justice, the Court cannot find that the largely speculative harm to the legal profession's image justifies this provision's restriction on the free flow of information to individuals at a time when that information is critically needed.

## III. CONCLUSION

For all of the above stated reasons, the Court finds that the State has failed to demonstrate that § 1(A)(2) advances in a direct and material way any "substantial interest" identified by the State. Accordingly, the Court finds that the challenged provision is an unconstitutional restriction of speech and should not be enforced. A separate order will issue.

9. Further undermining any argument that this provision advances the administration of justice is a concern first raised by the Attorney General: A court is also unlikely to overlook the fact that, unlike the typical personal injury plain-

## ORDER

In accordance with the foregoing Memorandum and for the reasons stated therein, IT IS this 18th day of October, 1996, by the United States District Court for the District of Maryland, ORDERED:

1. That the Motion of the Maryland Criminal Defense Attorneys' Association to Appear as Amicus, Paper No. 26, is hereby GRANTED;

2. That Plaintiffs' Motions for Summary Judgment, Papers Nos. 14 and 18, are hereby GRANTED;

3. That Section 1(A)(2) of Senate Bill 14, 1996 Md.Laws ch. 669, is hereby declared to be unconstitutional and its enforcement permanently enjoined;

4. That Defendant's Motion for Summary Judgment is hereby DENIED;

5. That Plaintiffs' motions to amend their respective complaints, Papers No. 21 and 24, are hereby DENIED as moot;

6. That Plaintiff Ficker's Motion for a Preliminary Injunction, Paper No. 17, is DENIED as moot;

7. That this action is hereby CLOSED;

8. That the Clerk of the Court shall mail copies of the foregoing Memorandum and this Order to all counsel of record.

tiffs, criminal defendants are in litigation against the State. Thus, the effect of the law, if not its intent, is to make it more difficult for our opponents to get legal representation. Defendant's Exhibit 1 at 4 n. 3.