Robin K.A. FICKER; Natalie M. Boehm, t/a Lets Company, Plaintiffs–Appellees,

v.

J. Joseph CURRAN, Jr., Defendant–Appellant,

North Carolina State Bar; Maryland Criminal Defense Attorneys' Association (MCDAA); American Civil Liberties Union, of Maryland; American Civil Liberties Union of the National Capitol Area; Gary Brewer; Miguel Hernandez; Steven Rhodes; Wendell H. Sawyer; K.E. Krispen Culbertson; I.E. Clarke Dummit, Amici Curiae.

No. 96–2724.

United States Court of Appeals, Fourth Circuit.

Argued June 6, 1997.

Decided July 23, 1997.

**ARGUED:** Robert Anthony Zarnoch, Assistant Attorney General, Annapolis, MD, for Appellant. Alan Edward D'Appolito, Upper Marlboro, MD, for Appellees. Charles Haven Wilson, American Civil Liberties Union of the National Capitol Area, Washington, DC, for Amici Curiae. **ON BRIEF:** J. Joseph Curran, Jr., Attorney General of Maryland, Annapolis, MD; Margaret Witherup Tindall, Staff Attorney, Baltimore, MD, for Appellant. Robin K.A. Ficker, Bethesda, MD, for Appellees. Arthur B. Spitzer, Stephen M. Block, American Civil Liberties Union of the National Capitol Area, Washington, DC; Dwight H. Sullivan, American Civil Liberties Union of Maryland, Baltimore, MD, for Amici Curiae ACLU, et al. Michael F. Easley, North Carolina Attorney General, Edwin M. Speas, Jr., Senior Deputy Attor-

ney General, Norma S. Harrell, Special Deputy Attorney General, Thomas F. Moffitt, Special Deputy Attorney General, North Carolina Department of Justice, Raleigh, NC, for Appellee State Bar. M. Albert Figinski, Weinberg & Green, L.L.C., Baltimore, MD, for Amicus Curiae Maryland Defense Attorneys. Seth R. Cohen, Smith, Follin & James, L.L.P., Greensboro, NC, for Amici Curiae Sawyer, et al.

Before WILKINSON, Chief Judge, MICHAEL, Circuit Judge, and MICHAEL, Senior United States District Judge for the Western District of Virginia, sitting by designation.

Affirmed by published opinion. Chief Judge WILKINSON wrote the opinion, in which Judge MICHAEL and Senior Judge MICHAEL joined.

## OPINION

WILKINSON, Chief Judge:

Robin Ficker, a Maryland attorney, and Natalie Boehm, the owner of a direct-mail advertising company, challenged the constitutionality of a Maryland law forbidding lawyers from targeted direct-mail solicitation of criminal and traffic defendants within thirty days of arrest. We agree with the district court that the Maryland ban encroaches impermissibly on First Amendment rights, and we accordingly affirm its judgment.

### I.

During its 1996 session, the Maryland General Assembly enacted a new restriction on lawyer advertising, requiring that attorneys wait thirty days after an accident, disaster, criminal charge or traffic charge before mailing out targeted solicitation to victims or arrestees and their relatives. Md.Code Ann., Bus. Occ. & Prof. § 10–605.1(a). The new law went into effect on October 1, 1996, with violations punishable by a fine of up to $1,000 and incarceration for up to one year.

Appellees Robin Ficker and Natalie Boehm challenged the constitutionality of those portions of the statute which applied to criminal and traffic defendants.[1] Ficker is a Maryland attorney who represents traffic defendants facing possible incarceration. He has traditionally obtained clients by mailing letters to individuals who have been issued traffic citations. Boehm owns and manages LETS Company, which produces and mails attorney advertising letters to individuals charged with criminal offenses or jailable traffic offenses.

The district court granted Ficker and Boehm's motions for summary judgment, ruling that the challenged portions of the statute were unconstitutional. *Ficker v. Curran,* 950 F.Supp. 123 (D.Md.1996). The court referenced a letter of Maryland's Attorney General to the Governor prior to the passage of the law, which concluded that: "No evidence in the files reflects that citizens generally find it offensive that attorneys offer information and services to traffic and criminal defendants who, in fact, desperately need them. Therefore, it is our view that this portion of the bill is unconstitutional and should not be enforced." *See id.* at 128. The district court agreed with this position, finding that Maryland "failed to demonstrate that § 1(a)(2) advances in a direct and material way any 'substantial interest' identified by the State." *Id.* at 129. It concluded that the "largely speculative harm to the legal profession's image" could not justify the law's "restriction on the free flow of information to individuals at a time when that information is critically needed." *Id.* Maryland now appeals.

### II.

The Supreme Court has regularly reaffirmed the protected status of attorney advertising, extending First Amendment coverage to a variety of forms of lawyer advertising embodying a wide range of content. In *Bates v. State Bar of Ari-*

---

1. The relevant provision states: "A lawyer may not send a written communication, directly or through an agent, to a prospective client for the purpose of obtaining professional employment if the communication concerns ... a criminal prosecution, or a prosecution of a traffic offense that carries a period of incarceration, involving the person to whom the communication is addressed or the person's relative, unless the charging document was filed more than 30 days before the date the communication is mailed." Md. Code Ann., Bus. Occ. & Prof. § 10 605.1(a)(2).

*zona,* 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977), the Court rejected the view that "protecting professionalism" sufficed to bar attorney advertising, and found such communications to be a species of "commercial speech" to which it had earlier afforded First Amendment protection in *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976). The Court initially accorded First Amendment protection to attorneys' newspaper and telephone directory advertisements. *Bates,* 433 U.S. 350, 97 S.Ct. 2691. It later extended the protection to advertising on an attorney's own letterhead, *Peel v. Attorney Registration and Disciplinary Comm'n of Illinois,* 496 U.S. 91, 110 S.Ct. 2281, 110 L.Ed.2d 83 (1990), mailed announcement cards, *In re R.M.J.,* 455 U.S. 191, 102 S.Ct. 929, 71 L.Ed.2d 64 (1982), and targeted, direct-mail solicitation, the very medium of communication which is the subject of this case, *Shapero v. Kentucky Bar Association,* 486 U.S. 466, 108 S.Ct. 1916, 100 L.Ed.2d 475 (1988).

The content of protected advertisements has been as varied as the form. It includes the attorney's areas of practice, the jurisdictions in which the attorney is licensed, *R.M.J.,* 455 U.S. 191, 102 S.Ct. 929, and attorney specialties and certifications, *Peel,* 496 U.S. 91, 110 S.Ct. 2281. Advertisements were permitted to contain accurate, nondeceptive illustrations, even if such ads were "embarrassing or offensive" to some members of the population, or "beneath the dignity" of some members of the bar. *Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio,* 471 U.S. 626, 648, 105 S.Ct. 2265, 2280, 85 L.Ed.2d 652 (1985). The Court has also recognized that an attorney's First Amendment right to advertise necessarily includes the right to tailor the content of the ad to persons with specific legal problems. *Id.* Speaking for a unanimous Court in *R.M.J.,* 455 U.S. at 203, 102 S.Ct. at 937, Justice Powell summarized the standards applicable to lawyer advertising:

> Truthful advertising related to lawful activities is entitled to the protections of the First Amendment. But when the particu-

lar content or method of the advertising suggests that it is inherently misleading or when experience has proved that in fact such advertising is subject to abuse, the States may impose appropriate restrictions. Misleading advertising may be prohibited entirely. But the States may not place an absolute prohibition on certain types of potentially misleading information.... Even when communication is not misleading, the State retains some authority to regulate. But the State must assert a substantial interest and the interference with speech must be in proportion to the interest served.

The Court has permitted prohibition of an attorney's right to advertise only in the limited class of circumstances where state interests are strong and the potential harm of nonregulation severe. For example, the Court has permitted prohibition of in-person solicitation of accident victims on the grounds that such solicitation exerts an impermissible pressure not present in public advertisements. *Ohralik v. Ohio State Bar Association,* 436 U.S. 447, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978). Where the in-person solicitation is by a non-profit organization, however, the danger of undue influence is minimized and outweighed by the value of the information and the right to free speech. *In re Primus,* 436 U.S. 412, 98 S.Ct. 1893, 56 L.Ed.2d 417 (1978).

The Court has also ruled that targeted direct-mail solicitation of accident victims and their families in the "immediate aftermath of accidents" is subject to state regulation. In *Florida Bar v. Went For It, Inc.,* 515 U.S. 618, 115 S.Ct. 2371, 132 L.Ed.2d 541 (1995), the Court allowed the state to require that lawyers await the passage of a thirty day period of "special vulnerability and private grief," before communicating with victims about the possibility of bringing suit. The Court reiterated that regulation of commercial speech was subject to intermediate scrutiny under the traditional framework of *Central Hudson Gas & Electric Corp. v. Public Service Comm'n of N.Y.,* 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980), namely that the government must show that its regulation directly and materially advances a sub-

stantial state interest and is "narrowly drawn." *Florida Bar*, 515 U.S. at 621–25, 115 S.Ct. at 2375–76. In so doing, the Court expressed no intention to abridge previously-recognized First Amendment advertising rights outside the accident victim context. "Nearly two decades of cases have built upon the foundation laid by *Bates*," noted the Court. "It is now well established that lawyer advertising is commercial speech and, as such, is accorded a measure of First Amendment protection." *Id.* at 623, 115 S.Ct. at 2375.

## III.

Against this backdrop, we have little difficulty in concluding that the Maryland law implicates First Amendment interests—perhaps most significantly the interests of criminal and traffic defendants in receiving information about legal representation. Recipients retain an independent First Amendment interest in acquiring such information, even when that information could be obtained by other means. *Virginia Pharmacy,* 425 U.S. at 757 n. 15, 96 S.Ct. at 1823 n. 15. Recognizing the importance of this interest, the Supreme Court observed in *Bates* that the dissemination of advertising information to the public had the potential to contribute substantially to fair legal process. 433 U.S. at 376, 97 S.Ct. at 2705. Similarly, in *Peel,* 496 U.S. at 110, 110 S.Ct. at 2293, the Court noted that such advertising "facilitates the consumer's access to legal services and thus better serves the administration of justice." In the instant case three Maryland residents—Gary Brewer, Miguel Hernandez, and Steven Rhodes—appear as amicae urging this court to take notice of the interests of the consumer of legal services. Brewer, Hernandez, and Rhodes have all faced Driving While Intoxicated (DWI) charges in Maryland, and all three found solicitation letters from attorneys to be of assistance in protecting their rights and in selecting an affordable lawyer in a timely fashion.

Attorneys, too, have a First Amendment interest—speaking in the commercial marketplace of attorney services. "[W]e may assume that the advertiser's interest is a purely economic one. That hardly disqualifies him from protection under the First Amendment." *Virginia Pharmacy,* 425 U.S. at 762, 96 S.Ct. at 1826. The lawyer need not "editorialize" or "report any particularly newsworthy fact." *Id.* Instead, the "idea" protected by the First Amendment is simply: "I will sell you the X [legal service] at the Y price." *Id.* Banning direct-mail advertising skews the market in favor of those attorneys who can afford television advertising, or in favor of established attorneys who are already known by word of mouth. In that sense, then, the ban operates, at least indirectly, as a barrier to professional entry. *See Bates,* 433 U.S. at 378, 97 S.Ct. at 2706. It is not surprising, as the district court observed, that many of the arguments against direct-mail advertising are offered by "attorneys who apparently do not use direct-mail but are in direct competition with those attorneys that do." *Ficker,* 950 F.Supp. at 127 n. 7.

Maryland argues, however, that the infringement on free speech in this case is necessary to advance important governmental interests such as shielding recipients from undue influence or confusion, guarding recipients' privacy, and protecting the reputation of the legal profession. While we recognize the substantiality of each of these state interests in the abstract, we are not persuaded that the Maryland ban directly and materially advances them. *See Central Hudson,* 447 U.S. at 565, 100 S.Ct. at 2351.

First, as the Supreme Court has already recognized, targeted letters do not carry the same potential for undue influence as in-person solicitation, and such letters are no more likely to overwhelm the judgment of a potential client than an untargeted letter or newspaper advertisement. *Shapero,* 486 U.S. at 475, 108 S.Ct. at 1922–1923. Thus, this type of solicitation is "conducive to reflection and the exercise of choice on the part of the consumer." *Id.* at 476, 108 S.Ct. at 1923. The recipient of a letter is not subject to "the coercive force of the personal presence of a trained advocate" or the "pressure on the potential client for an immediate yes-or-no answer to the offer of representation." *Zauderer,* 471 U.S. at 642, 105 S.Ct. at 2277.

In fact, the recipient can "effectively avoid further bombardment of [his] sensibilities simply by averting [his] eyes." *Ohralik*, 436 U.S. at 465 n. 25, 98 S.Ct. at 1923 n. 25 (quoting *Cohen v. California*, 403 U.S. 15, 21, 91 S.Ct. 1780, 1786, 29 L.Ed.2d 284 (1971)). He can ignore, discard, or save the letter for future consideration. *Shapero*, 486 U.S. at 476, 108 S.Ct. at 1923.

Neither can Maryland's asserted interest in protecting the privacy of criminal and traffic defendants from intrusive attorney contact support the abrogation of free speech in this case. The Supreme Court has already explained in *Shapero* that "a targeted letter [does not] invade the recipient's privacy any more than does a substantively identical letter mailed at large. The invasion, if any, occurs when the lawyer discovers the recipient's legal affairs, not when he confronts the recipient with the discovery." 486 U.S. at 476, 108 S.Ct. at 1928. In the case of criminal and traffic defendants, their legal problems are already known. The arrest is a matter of public record before any letters are sent. In some jurisdictions, a list of arrestees is published in a local newspaper. Court appearances are mandatory and public. At most, a thirty day ban might help a defendant keep his legal problems secret from his family for a month. However, he will be at least as annoyed at being solicited on the thirty-first day; perhaps more so because his attempt at secrecy has been foiled after thirty days of apparent success. Furthermore, in the case of defendants charged with driving while intoxicated, Maryland already permits immediate direct-mail solicitation for representation in administrative license proceedings, so any interest in privacy from attorney intrusion is already compromised during the initial month.

Maryland next asserts an interest in protecting the reputation and dignity of the legal profession, derivative of its interest in the fair administration of justice. In support of this contention, the Attorney General points to a study conducted by the North Carolina Bar which found that "many" traffic offenders thought targeted direct mail violated their privacy. However, amici Sawyer, Culbertson, and Dummit, three members of the North Carolina bar, offer in reply a different North Carolina survey, with an allegedly larger sample population and smaller margin of error, which shows that a majority of North Carolinians would not object to receiving attorney letters after getting a traffic ticket, and would actually like to receive such letters if they were arrested for driving under the influence or for a small crime. We will not resolve this battle of studies, nor will we credit or discredit state interests based on the shifting sands of polling data, which change according to techniques, sample populations, and even the phrasing of the questions.[2] It is hardly clear, however, that where criminal and traffic defendants, in need of timely legal advice and representation, receive just such information in the mail, they will hold the legal profession in low esteem.

Moreover, any negative attitude toward the legal profession that a criminal defendant might have after receiving unwanted mail on day one or twenty-one will not dissipate by day thirty-one. Any disrespect to the legal profession engendered by targeted direct-mail solicitation would not be caused by the timing of the targeted letters, as was the case in *Florida Bar*, but a general distaste for such solicitation. The Supreme Court has already ruled that attorneys' targeted direct-mail solicitation is expression worthy of First Amendment protection. *Shapero*, 486 U.S. 466, 108 S.Ct. 1916. The fact that protected speech might prove offensive to some people has never justified its suppression for all people, *Carey v. Population Services, Int'l*, 431 U.S. 678, 701, 97 S.Ct. 2010, 2024, 52 L.Ed.2d 675 (1977), and the Supreme Court forbids us from banning speech merely because some subset of the public or the bar finds it embarrassing, offensive, or undignified. *Zauderer*, 471 U.S. at 648, 105 S.Ct. at 2280.

**2.** Maryland argues that the Supreme Court relied on polling data in *Florida Bar*. However, the Court used the data only as confirmation of the fact that the regulation targeted a "concrete, nonspeculative harm" in the "immediate after-

math of accidents," 515 U.S. at 629, 115 S.Ct. at 2378. If the Court had rested its decision on the polling data, presumably it would have undertaken some evaluation of the reliability of the data, which it declined to do.

Finally, the statutory means are not drawn with sufficient precision to withstand scrutiny. *See Central Hudson,* 447 U.S. at 565, 100 S.Ct. at 2351. In defending restrictions on commercial speech, the state need not prove that it has used the least restrictive means of achieving its goal, *Board of Trustees of State University of New York v. Fox,* 492 U.S. 469, 480, 109 S.Ct. 3028, 3034–35, 106 L.Ed.2d 388 (1989), but the availability of "numerous and obvious less-burdensome alternatives to the restriction on commercial speech ... is certainly a relevant consideration in determining whether the 'fit' between ends and means is reasonable." *City of Cincinnati v. Discovery Network, Inc.,* 507 U.S. 410, 418 n. 13, 113 S.Ct. 1505, 1510 n. 13, 123 L.Ed.2d 99 (1993). Maryland itself has implicitly acknowledged less-burdensome alternatives to this thirty day ban. For example, the state could require that envelopes and letters be labeled as advertisements to avoid confusion on the part of recipients. And, as the Supreme Court suggested in *Shapero,* the state could avert misrepresentation by requiring the text of any written communication to be filed with a state agency. This would give the state "ample opportunity to supervise mailings and penalize actual abuses." 486 U.S. at 476, 108 S.Ct. at 1923; *In re R.M.J.,* 455 U.S. 191, 206, 102 S.Ct. 929, 939, 71 L.Ed.2d 64 (1982); *see e.g.* Fla. Bar Rule 4–7.4(b)(2)(B).

## IV.

In *Florida Bar,* 515 U.S. 618, 115 S.Ct. 2371, the Supreme Court upheld a ban on targeted direct-mail advertising to personal injury or wrongful death clients within thirty days of their accidents. Maryland argues that *Florida Bar* requires that we sustain the ban on direct-mail solicitation in this case as well.

We are unpersuaded. Both the First Amendment interests and the government interests in this case differ markedly from those in *Florida Bar,* and accordingly dictate a different outcome. First, the Court in *Florida Bar* rested its conclusion largely on the principle that the privacy of accident victims and wrongful death clients deserves protection in order to provide them with a period to cope with their grief before being asked to redress an emotional loss. *Florida Bar,* 515 U.S. at 629–32, 115 S.Ct. at 2379. The Court cited the examples of a Florida man who was " 'appalled and angered by the brazen attempt' of a law firm to solicit him by letter shortly after he was injured and his fiancee was killed in an auto accident," and another who found it " 'despicable and inexcusable' " that his mother received a solicitation three days after his father's funeral. *Id.* at 625–29, 115 S.Ct. at 2377–78. The Court recognized that this invasion of "privacy and tranquility" during "personal grief in times of trauma" was an entirely "different kind of intrusion" from an attorney's sifting through public records seeking prospective clients. *Id.* at 629–32, 115 S.Ct. at 2379. The *Florida Bar* majority further determined that crass intrusions on the healing process reflect poorly on the legal profession. The case before us lacks a similar justification for banning speech. While a criminal or traffic defendant may be shaken by his arrest, what he needs is representation, not time to grieve.

Second, while accident victims typically have three years in which to file a claim, criminal defendants are subject to a much more accelerated calendar. Defendants can lose rights if unrepresented for thirty days after arrest—the process of hearings and arraignments can be bewildering to someone unschooled in the ways of the law. As the Attorney General acknowledged in his letter to the Governor, a criminal defendant "often must act quickly in order to preserve important rights." In Maryland, for example, a DWI defendant who refuses to take a blood alcohol test or whose test registers above 0.10 has his driver's license confiscated at the time of the offense, and must request a hearing if he desires to show cause why his license should not be suspended. Md.Code Ann., Transp. II § 16–205.1(b)(3). If he requests this hearing within ten days of being stopped by the police, the hearing must be scheduled within forty-five days. If he misses the ten-day window, the hearing need not be scheduled within forty-five days, and the defendant faces an extended suspension of his license. The relative urgency of the

defendant's need for legal representation finds no parallel in the civil plaintiff.

Third, a criminal defendant's privacy concerns differ considerably from those of a potential civil plaintiff. Unlike an accident victim, who can choose to avoid public scrutiny of his private affairs by not filing a suit or by settling quietly, the criminal arrestee is in the legal system involuntarily and has already had his privacy compromised before a solicitation letter is ever sent.

Fourth, unlike a civil litigant, the criminal or incarcerable traffic defendant enjoys a Sixth Amendment right to counsel. *Argersinger v. Hamlin,* 407 U.S. 25, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972). The importance of that right is underscored by the requirement that criminal defendants must be promptly informed of it. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). We recognize that the right to counsel of choice is anything but absolute, *see Wheat v. United States,* 486 U.S. 153, 163, 108 S.Ct. 1692, 1699, 100 L.Ed.2d 140 (1988), and the state retains significant responsibilities in regulating representation for criminal defendants. *See, e.g., Miller v. Smith,* 115 F.3d 1136 (4th Cir.1997) (en banc) (state has authority to require indigent criminal defendants to apply for legal representation with the Public Defender's Office as a prerequisite to obtaining free trial transcripts). Even so, when the state itself is prosecuting a defendant, it cannot lightly deprive its opponent of critical information which might assist the exercise of even a qualified right. As Maryland's Attorney General advised the Governor before the passage of this law, "unlike the typical personal injury plaintiffs, criminal defendants are in litigation against the State. Thus, the effect of the law, if not its intent, is to make it more difficult for our opponents to get legal representation."

The differences between this case and *Florida Bar* are manifold. Accordingly, we hold that a thirty day ban on attorney advertising to defendants charged with crimes and incarcerable traffic offenses cannot stand.

## V.

Our holding is a narrow one. We reiterate the Supreme Court's admonition that those forms of lawyer solicitation which cross the line into coercion are not protected. *See, e.g., Ohralik,* 436 U.S. 447, 98 S.Ct. 1912; *Florida Bar,* 515 U.S. 618, 115 S.Ct. 2371. We do not address personal visits, phone calls, or other more invasive attorney tactics in this case. We do not bar the state from regulating lawyer advertising which is inaccurate or misleading. We merely find that Maryland's thirty day ban on direct-mail solicitation to traffic and criminal defendants cannot withstand review. The judgment of the district court is therefore affirmed.

*AFFIRMED.*