### FORD MOTOR COMPANY

### v.

### TEXAS DEPARTMENT OF TRANSPORTATION, et al.

### No. A 99 CA 764 SS.

United States District Court, W.D. Texas, Austin Division.

July 21, 2000.

---

Billy M. Donely, David R. Jarrett, Baker & Hostetler, Houston, TX, Kenneth R. Valka, Baker & Hostetler, Houston, TX, William A. Zolbert, Office of General Counsel, Ford Motor Company, Dearborn, MI, for Plaintiff.

Linda B. Secord, Attorney General of Texas, Austin, TX, Brian Edward Berwick, Attorney General's Office, Environmental Protection Division, Austin, TX, for Defendants.

## *ORDER*

SPARKS, District Judge.

BE IT REMEMBERED that on the 20th day of July 2000, the Court reviewed the file in the above-styled cause, specifically the defendant's Motion for Summary Judgment [# 45], the plaintiff's response thereto [# 50], and the defendant's reply thereto [# 58] as well as the plaintiff's Motion for Summary Judgment [# 46], the defendant's response thereto [# 50], and the plaintiff's reply thereto [# 55]. After considering the motions, the arguments of counsel, the file as a whole and the applicable law, the Court enters the following order and opinion.

### Factual Background

The plaintiff Ford Motor Company ("Ford"), a Delaware corporation with its principal place of business in Dearborn, Michigan, is licensed under the Texas Motor Vehicle Commission Code ("the Code") to operate as a motor vehicle manufacturer in Texas. Since May 1998, Ford has been operating a web site through which consumers can view available pre-owned vehicles for sale or lease.[1] These vehicles have a no-haggle price, which has been set by Ford. In certain limited areas, the consumer can place a "hold" on a specific vehicle and choose a specific dealership at which to view the vehicle.[2] Ford confirms the hold with a telephone call and then transfers the vehicle to the designated dealership after the consumer has placed a refundable deposit on the vehicle, either over the internet or by telephone.[3] If the consumer decides to purchase the vehicle after a test drive, then the consumer and the dealership enter into a sales agreement. The terms of any trade-in are negotiated between the consumer and the dealer. According to Ford, an individual dealership's participation in this program, which requires an agreement to honor the no-haggle price that has been determined by Ford, is completely voluntary. *See* Original Complaint and Motion for Temporary Restraining Order [# 1], Exh. A. When a consumer comes to a dealership for the purpose of viewing a vehicle selected from the Showroom, the dealership is prohibited from showing the consumer another vehicle until the consumer has clearly rejected the vehicle chosen from the Showroom.

Either Ford or Ford Motor Credit Company holds the title to these pre-owned vehicles. When a consumer requests a specific vehicle, the designated dealer takes title to the vehicle by assignment. If the consumer decides not to purchase the vehicle, then the dealer has the option of buying the vehicle at a wholesale price or returning the vehicle to Ford.

On November 2, 1999, Carol Kent, the Director of the Enforcement Section, Texas Department of Transportation, Motor Vehicle Division, filed an administrative complaint against Ford with the Motor Vehicle Board, which alleges Ford has vio-

---

1. According to Mr. Henry Cimo, these vehicles are obtained by Ford as repurchases from the rental company program, red carpet lease turn-ins or repossessions.

2. The web site, which is referred to as the Showroom, currently serves the metropolitan areas of Houston, Texas; Atlanta, Georgia; Boston, Massachusetts; Washington, D.C.; San Francisco, California; New York City, New York; and Newark, New Jersey as well as select areas of Alabama, Georgia, and Tennessee.

3. The deposit would be refunded by Ford only after the consumer took the car for a test-drive.

lated Texas law by selling pre-owned vehicles directly or indirectly to consumers through the Internet without a dealer's license in violation of Tex.Rev.Civ.Stat. art. 4413(36), §§ 4.01, 4.06(a)(3) and (6), and 5.02C(c). *See id.*, Exh. F. The Texas Motor Vehicle Commission Code prohibits anyone from "engag[ing] in business as, serv[ing] in the capacity of, or act[ing] as a dealer" without first obtaining a license. TEX.REV.CIV.STAT. ART. 4413(36), § 4.01(a). Additionally, the Code prohibits a manufacturer, like Ford, from directly or indirectly owning an interest in a dealer or dealership, operating or controlling a dealer or dealership, or acting in the capacity of a dealer. *See id.*, § 5.02C(c). Contemporaneously, Ms. Kent sent a letter to the dealers who participated in the Showroom project, informing them that Ford's conduct violated Texas law, the dealer was aiding and abetting this violation, and warning the dealer about the possible punishment. As a result, various dealers terminated their involvement with the Showroom project. *See id.*, Exh. C, at Exh. 5. An evidentiary hearing on the administrative complaint was held before an Administrative Law Judge on April 12–14, 2000 and April 17–18, 2000.

Ford alleges Brett Bray, the Director and Chief Executive and Administrative Officer of the Texas Department of Transportation, Motor Vehicle Board, is acting wholly without jurisdiction and in violation of the First Amendment, the Due Process Clause, and the Commerce Clause. Accordingly, Ford seeks declaratory and injunctive relief that would prevent Bray from (1) interfering with Ford's operation of the Showroom, (2) proceeding on the merits of the administrative complaint, and (3) sending letters to dealers that threatened civil penalties or the refusal to renew a license. On December 7, 1999, the Court denied the plaintiff's application for a temporary restraining order or preliminary injunction.

## Analysis

### I. Commerce Clause

■ The plaintiff argues Bray's attempt to enforce state law against activities conducted over the internet violates the dormant aspect of the Commerce Clause by unduly burdening interstate commerce. The plaintiff points out that the internet, like phones lines and the mail, is an instrumentality of interstate commerce. The plaintiff concludes that Bray is unconstitutionally discriminating against interstate commerce by effectively shutting down the internet showroom in favor of local franchised dealers. The plaintiff relies on a portion of Kent's deposition, in which she admits that § 5.02C(c) protects the economic interests of franchised dealers by not allowing the manufacturer to compete. The plaintiff argues Bray has failed to present evidence that a legitimate state interest is furthered by the statute because the information on the website is not misleading or inaccurate. The plaintiff further argues Bray has failed to present any evidence that it competes against Texas dealers.

Bray responds by relying on *Exxon Corp. v. Governor of Maryland,* 437 U.S. 117, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978), which upheld a state's ban on the ownership of gas stations by petroleum producers and refiners. According to the legislative history, the Code was meant to curb the disproportionate market power of manufacturers vis-a-vis franchised dealers. Bray asserts this is a valid state interest that is applied in a non-discriminatory way against all manufacturers, both in-state and out-of-state.

Based on valid legislative findings, the Texas Legislature has enacted a statutory scheme that attempts to equalize the market power between manufacturers and dealers, and further the public interest of the citizens of Texas, by prohibiting manufacturers from acting in the capacity of a dealer. *See, e.g.,* Defendant Bray's Appendix to Response to Ford's Motion for

Summary Judgment, Exh. 1 (Transcript of hearing before the House Committee on Transportation on H.B.3092, the precursor to § 5.02C). Thus, the plaintiff is prohibited from selling motor vehicles to consumers by mail, phone calls, leafleting, skywriting, or drum signals.[4] The Court rejects the plaintiff's argument that an activity which is appropriately regulated when accomplished through any other medium becomes sacrosanct when accomplished through the internet. If the Court were to accept the plaintiff's interpretation of *American Libraries Association v. Pataki*, 969 F.Supp. 160 (S.D.N.Y.1997), then all state regulatory schemes would fall before the mighty altar of the internet.[5] Under this theory, a state's deceptive trade practices act could not be enforced against goods advertised and sold through the internet nor could a state's criminal statutes which regulate the sale of alcohol. Although the internet is a mighty powerful tool, it is not so potent as to demolish every state's regulatory schemes as they apply to the sale of goods and services. Bray's attempt to effectuate the state's valid regulatory scheme does not unduly burden interstate commerce so as to violate the dormant aspect of the Commerce Clause. The Court also rejects the plaintiff's argument that the Code favors in-state interests at the expense of out-of-state interests. As explained by Bray, the Code generally prohibits manufacturers from selling motor vehicles to consumers in Texas, whether those manufacturers are located in Austin or Australia. The mere

fact that Bray is enforcing the state's regulatory scheme against a foreign corporation does not lead to the conclusion that Bray is attempting to enhance Texas commerce through unequal and oppressive tactics.[6]

## II. Equal Protection

The plaintiff next argues it is being unreasonably singled out and prohibited from participating in the pre-owned motor vehicle marketplace merely because the plaintiff is a manufacturer of new vehicles. The plaintiff further argues there is no evidence that the Code furthers the state's purported interest in reducing the disproportionate market power of manufacturers in the used motor vehicle market. The plaintiff points to GM Driversite, Inc., a subsidiary of General Motors, who has allegedly contracted with DeMontrond Enterprises, Inc. to operate the website. Kent has approved the operation of this website, which also offers "no haggle" prices for each of the vehicles displayed.

Bray responds that its decision to single out manufacturers is rationally related to a legitimate state interest in reducing the disproportionate market power of manufacturers. Bray further responds the De-Montrond has applied for and received a dealer's license, which enables it to operate the website without running afoul of the Code.

The Court is unpersuaded by the plaintiff's contention that the state's decision to treat manufacturers and dealers different-

---

4. As well as on a plane, on a train, in a house, or with a mouse.

5. The issue in *American Libraries Association* is dissimilar from the statute at issue in the above-styled cause. In *American Libraries Association*, the district court struck down a New York penal statute that prohibited using a computer to disseminate obscene material to minors. That law was a direct attempt to regulate the internet. In contrast, the Code at issue here precludes a manufacturer from acting in the capacity of a dealer, regardless of the mode of communication used. The fact that a law of general applicability affects Ford's use of the internet does not mean

Texas is attempting to directly regulate the internet.

6. The Court is unpersuaded by Ford's "the sky is falling" argument. The Texas regulatory scheme does not appear to preclude Ford from operating its Showroom in its entirety—it only prevents Ford from enlisting the assistance of Texas dealers in marketing previously owned motor vehicles to the citizens of Texas. As proposed by Bray, Ford could continue to operate the Showroom with some disclaimer, such as "offer invalid where prohibited by law."

ly is not rational. In support of this contention, the plaintiff points out that any large company, such as IBM or Shell Oil Company, could engage in pre-owned motor vehicle sales in Texas, if they obtained a license. Because other big companies could sell pre-owned cars, the plaintiff concludes it is not rational to prohibit it from doing so. This reasoning reflects a misunderstanding of the state's proffered reason for attempting to ameliorate the disparity in power between manufacturers and dealers. Manufacturers have more power, not merely because they are large companies, like IBM or Shell, but because they control a dealer's supply of vehicles. Because other large companies that are engaged in businesses unrelated to the manufacture of motor vehicles do not directly control the supply of vehicles, the Code does not seek to prohibit them from competing with dealers.

■ Although it is possible for Ford, as a class of one, to succeed on an equal protection claim, Ford has failed to establish that Bray has irrationally and intentionally singled Ford out for dissimilar treatment. *See Village of Willowbrook v. Olech,* —— U.S. ——, ——, 120 S.Ct. 1073, 1074, 145 L.Ed.2d 1060 (2000). Ford complains that DeMontrond is permitted to operate a website advertising previously owned motor vehicles. Ford alleges DeMontrond operates the website, which is owned by a General Motors subsidiary, through a license and access agreement. Bray has found this arrangement to comply with the state statutory scheme.

As discussed above, it is rational for the State to treat Ford, a manufacturer, differently from DeMontrond, a non-manufacturer. The record reflects that DeMontrond is not a manufacturer and has obtained a dealer's license from Bray. Ford does not allege that Bray has refused to permit it to contract with a third-party who holds a dealer's license, such as DeMontrond, for the purposes of running a website. Ford has failed to show it has

been singled out, irrationally, for disproportionate treatment.

## III. Vagueness

Next, the plaintiff argues the Code is so vague and indefinite as to be substantially incomprehensible because the Code fails to define "acting in the capacity of a dealer" and "operating or controlling a dealer or dealership." During her deposition, Kent said a person wanting to know if his conduct would violate these provisions should start by calling the Motor Vehicle Division to discuss the statute. Kent failed to provide any discrete guidelines by which a person could tell if his conduct would violate the statute.

Bray denies that the plaintiff has standing to properly challenge the statute on vagueness grounds. *See Parker v. Levy,* 417 U.S. 733, 94 S.Ct. 2547, 2562, 41 L.Ed.2d 439 (1974) (explaining that one to whose conduct a statute clearly applies may not successfully challenge the statute for vagueness). Bray contends that by choosing which vehicles to offer on the internet, holding title to the vehicles, accepting a deposit from the potential consumer before sending the vehicle to the designated dealership and setting a no haggle price, the plaintiff is clearly acting in the capacity as a dealer.

■ A law that is unduly vague violates due process. *See Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982) (explaining the complainant must demonstrate the law is impermissibly vague in all of its applications). Laws must "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned v. City of Rockford,* 408 U.S. 104, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222 (1972). However, the degree of vagueness that is constitutionally permissible depends on the nature of the enactment. *See Village of Hoffman Estates,* 102 S.Ct. at 1193 (explaining that an economic regulation is subject to a less

strict vagueness test, in part because the regulated enterprise may have the ability to clarify the meaning of the regulation by resort to an administrative process). In *Village of Hoffman Estates,* the Supreme Court considered a vagueness challenge to a quasi-criminal local ordinance that makes it unlawful for any person to "sell any items, effect, paraphernalia, accessory or thing which is designed or marketed for use with illegal cannabis or drugs." *Id.* at 1190. A store that sold a variety of smoking accessories challenged the language "designed or marketed for use" as impermissibly vague. Although the Supreme Court recognized that the ordinance and its accompanying regulations contained ambiguities, the Court rejected the plaintiff's facial challenge because it found at least some of the items sold by the plaintiff were covered by the ordinance.

■ The statute challenged by Ford suffers from a certain lack of clarity. Although § 5.02C(c) prohibits a manufacturer from directly or indirectly owning an interest in a dealer or dealership, operating or controlling a dealer or dealership or acting in the capacity of a dealer, nothing in the Code defines these activities. Ms. Kent's suggestion that a manufacturer that wished to comply with the law should call her office for an opinion about whether its proposed conduct violates the Code is contrary to the law in this area. As explained above, a statute must be written with sufficient clarity that a person of ordinary intelligence would have a reasonable opportunity to know what conduct was prohibited. A person should not have to request an interpretation of the law from the agency responsible for enforcing it, although such an advisory opinion would be helpful if the agency were willing to give it.

Nevertheless, after reviewing the statutory scheme, the Court finds that Ford, by setting the price, accepting a refundable deposit from the consumer on the vehicle, and holding title to the vehicle until the consumer has accepted the price set by Ford, should reasonably have known that its conduct in operating the Showroom would implicate the provisions of § 5.02C(c). Under these circumstances, Ford's vagueness challenge to an arguably quasi-criminal statute must fail.

## IV. First Amendment

■ The plaintiff also argues the regulatory scheme is invalid because Bray has used it to improperly suppress the plaintiff's legitimate commercial speech. The Supreme Court has repeatedly emphasized that although commercial speech receives some amount of protection under the First Amendment, that protection is far from absolute. *See Florida Bar v. Went For It, Inc.,* 515 U.S. 618, 115 S.Ct. 2371, 2375, 132 L.Ed.2d 541 (1995) ("Commercial speech enjoys a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values, and is subject to modes of regulation that might be impermissible in the realm of noncommercial expression."). In commercial speech cases, the Court applies a four-part analysis. First, the Court must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, the Court considers whether the asserted governmental interest is substantial. If both inquiries yield positive answers, the Court must determine whether the regulation directly advances the governmental interest asserted, and whether it is more extensive than is necessary to serve that interest. *See Joe Conte Toyota Inc. v. Louisiana Motor Vehicle Comm'n,* 24 F.3d 754, 755 (5th Cir.1994) (discussing the *Central Hudson* factors).

The plaintiff asserts that its speech in the Showroom is lawful because it does nothing more than propose a commercial transaction and the content of the speech is not misleading or inaccurate. The plaintiff argues Bray does not have a substantial interest in prohibiting or regulating

the free flow of communication in the Showroom. Even if Bray has a substantial interest in preventing motor vehicle manufacturers from unfairly competing against dealers, the plaintiff claims this interest is not furthered because the Showroom does not compete against dealers. Bray responds that the plaintiff's commercial speech concerns an activity that is made unlawful by the Code—the retail sale of a manufacturer's inventory of used vehicles to consumers—so the speech is not entitled to First Amendment protection.

■ It appears from the record before the Court that the speech at issue—a manufacturer's advertisement of used motor vehicles for a price that is fixed by a manufacturer—does not concern lawful activity. As discussed above, a constitutionally valid Texas law prohibits a manufacturer from acting in the capacity of a dealer. The plaintiff concedes that it is a licensed manufacturer under Texas law. The plaintiff further concedes that it (1) holds the title to all the vehicles offered in the Showroom, (2) chooses which vehicles will be advertised, (3) sets the price for the vehicles, (4) determines the commission of the dealer who formalizes the "sale" of the vehicle, and (5) pays all shipping fees to transfer the vehicle to the specified dealer. Although the plaintiff never enters into a formal contract of sale with the consumer, the plaintiff has dictated the material terms of the offer of sale and the consumer accepts those terms before title is transferred to the dealer, who then assigns the title to the consumer. The Texas Motor Vehicle Board could reasonably find the plaintiff is acting in the capacity of a dealer through its direct advertisement of used vehicles with prices fixed by the plaintiff in the Showroom. Because the plaintiff's speech concerns an unlawful activity, Bray is free to regulate it. *See Florida Bar*, 115 S.Ct. at 2376.

■ Alternatively, the Court finds Bray has asserted a substantial government interest that is directly advanced by a statute that is narrowly drawn. The Texas Legislature has determined that manufacturers possess disproportionate power vis-a-vis dealers. Bray asserts it has a substantial interest in preventing motor vehicle manufacturers from unfairly competing against dealers through this disparity. Bray has identified a concrete, nonspeculative harm. *See Bailey v. Morales*, 190 F.3d 320, 322 (5th Cir.1999) (explaining states may justify speech regulations by reference to studies and anecdotes pertaining to different locales or even based solely on history, consensus, and simple common sense). Bray directly advances this goal by differentiating between the rights and responsibilities of dealers and manufacturers and by prohibiting manufacturers from directly competing with dealers in the sale of motor vehicles. This regulatory scheme is a reasonable means of limiting the power of manufacturers over dealers. *See Florida Bar*, 115 S.Ct. at 2380 (requiring a reasonable fit between the legislature's ends and the means chosen to accomplish those ends). The Court finds the Code is narrowly tailored to advance this interest. Based on the record, the Court finds Bray has carried its burden of justifying its restriction on the plaintiff's commercial speech.

The plaintiff's arguments to the contrary—that the state's interest is not furthered by the enforcement action because the plaintiff does not compete against dealers—is unpersuasive. The record shows the plaintiff has the first pick of the cars returned through repurchases, lease returns and repossessions. The plaintiff determines the price for these vehicles as well as the profit the dealer, who voluntarily facilitates the sale, will receive. If the consumer declines to purchase the car after a test drive, the dealer has the option of purchasing the vehicle from the plaintiff at a wholesale cost. Then, the dealer can offer the vehicle for sale at a price designated by the dealer. If a particular vehicle is not purchased through the Showroom, either by a consumer or a dealer, then the plaintiff removes the vehicle from

the Showroom and offers it for sale to dealers through an auction. Again, the dealer is then free to set the price for the vehicle. In our economy, the plaintiff's ability to dictate the price for the vehicles offered in the Showroom affects a dealer's ability to set the price for similar vehicles at the dealership.

## V. Procedural Due Process

Finally, the plaintiff argues it is being denied a fair trial in the enforcement action before the administrative law judge. The plaintiff argues the administrative proceeding has been predetermined by Kent and Bray. The plaintiff claims it cannot receive a fair hearing because Bray supervises Kent, who supervises the attorneys prosecuting the enforcement action. Bray also supervises Molly Singletary, who supervises the Administrative Law Judges presiding over enforcement actions.

Bray denies having improper influence over the administrative process and points out the letter from Kent was sent in her capacity as a civil prosecutor. Under the Board rules, Bray is prohibited from discussing the merits of the pending enforcement action with the hearing officer outside the presence of all the parties.

The Court is unpersuaded by Ford's bald supposition that it will be denied procedural due process in the state's administrative proceeding. Ford has offered no evidence that Bray has acted in bad faith or has exerted inappropriate pressure on the administrative law judge who will determine the merits of the enforcement action. The Court declines to presume any such misconduct on the part of a state official under these circumstances.

## VI. Conclusion

The plaintiff's entire argument is an attempt to avoid the Texas Motor Vehicle Commission Code. The plaintiff has mounted a substantive attack on Texas' decision to prohibit manufacturers from selling vehicles to consumers and attempted to cloak that attack in a constitutional challenge. It is a legitimate exercise of the state's police power for Texas to regulate who is qualified to sell motor vehicles in Texas and under what conditions. Ford's argument that it is not rational for Texas to treat manufacturers differently from dealers with regard to both new and previously owned motor vehicles is unpersuasive.

It appears that under the Code, Ford would not be permitted to offer these vehicles for sale, albeit ostensibly through a dealer, by posting fliers on the Drag or calling random individuals listed in the phone book. The fact that the plaintiff is attempting to use the internet to disseminate this information is not constitutionally significant under these circumstances. If the Court were to accept the plaintiff's arguments about the interplay between the internet and the Commerce Clause, all states' regulatory schemes would be nullified. This is an absurdity that the Court declines to accept. The Court emphasizes that Ford is mounting a challenge to a regulatory scheme of general applicability, not one that attempts to regulate directly and primarily transactions that take place on the internet. Ford's presentation of the "parade of horribles" that will occur if Bray is permitted to continue with its enforcement action is unpersuasive and constitutionally insignificant under these circumstances. The plaintiff has identified various reasons why it is in the interest of the manufacturer, the dealer, and the public to permit the plaintiff to advertise fixed price vehicles on an internet site. These arguments are more appropriately addressed to the Texas Legislature than a federal district court. Because the Court finds Ford has failed to establish that it is entitled to any of the declaratory or equitable relief it seeks, judgment will be entered in favor of Bray on Ford's constitutional challenges to the Code. The Court expresses no opinion as to the merits of the enforcement proceeding before the administrative law judge. The Court declines

to determine whether Ford's conduct violates the Code as this determination is best made by the administrative law judge.

In accordance with the foregoing, the Court enters the following orders:

IT IS ORDERED that the plaintiff's Motion for Summary Judgment [# 46] is DENIED;

IT IS FURTHER ORDERED that Bray's Motion for Summary Judgment [# 45] is GRANTED IN PART as discussed above;

IT IS FURTHER ORDERED that Bray's Motion to Place Appendix Under Seal [# 47] is GRANTED;

IT IS FURTHER ORDERED that the Plaintiff's Motion to Seal Summary Judgment Motion and Exhibits [# 48] is GRANTED;

IT IS FURTHER ORDERED that the Plaintiff's Motion to Seal Exhibits B, C, D, and E to Plaintiff's Letter Brief Dated May 5, 2000[# 59] is GRANTED; and

IT IS FINALLY ORDERED that all remaining motions are DISMISSED AS MOOT.

### *JUDGMENT*

BE IT REMEMBERED that on the 20th day of July 2000, the Court entered its order granting summary judgment on behalf of the defendants in the above-styled cause, and thereafter enters the following judgment:

IT IS ORDERED, ADJUDGED, and DECREED plaintiff Ford Motor Company TAKE NOTHING against defendant Brett Bray, in his official capacity as the Director and Chief Executive and Administrative Officer of the Texas Department of Transportation, Motor Vehicle Board, and that the defendant go hence without delay and with its costs, for which let execution issue against the plaintiff.